The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the 4th Circuit are admonished to give their attention for the Court is now sitting. God save the United States and this Honorable Court. Good morning. Mr. Drennan, you may proceed. Thank you, Judge Gregory. My name is Joseph Peter Drennan and may it please the Court. I represent the appellant in this action, Yusuf Abdi Ali. Mr. Ali is a legal permanent resident of the U.S. who resides in Northern Virginia. He's also a former colonel in the Somali National Army who has resided in the U.S. for decades. The complaint in this case was filed on the 13th of June, 2005. That complaint contained a number of allegations of wrongdoing against my client, Ali, by the plaintiff, Warfaa, in the December 1987 to March 1988 timeframe. Warfaa brought his action under the Alien Tort Statute and the Torture Protection Act. As the Court knows, this case has been up before the Court a couple of years ago on our immunity defense, which was found to be unavailing. However, the Court did affirm Judge Brinkman's dismissal of the Alien Tort Statute claim, so the TVPA claim is the only claim that remained extant. That claim carries a 10-year limitations period. How long did it take Warfaa to bring his action? It took 15 years. Why did Warfaa wait 15 years to file this case? Well, the Warfaa's counsel pleaded equitable tolling. Their contention was that Warfaa could not have brought his case for many years during the 1990s because of allegations, generalized allegations of conditions in Somalia that were not conducive to bringing suit or investigating a complaint. We, in terms of narrowing this matter down, conceded that our limitations defense, and we've abided by our contention raised in the answer that was ultimately filed, that Warfaa is not entitled to equitable tolling. Why is Warfaa not entitled to equitable tolling? Because his experts, which constituted the only putative proof of adduced for equitable tolling, made no reference whatsoever to Warfaa's individual circumstances. Rather, they just made broad-brush descriptions of the shambolic state of the courts and of security within Somalia. They made no reference whatsoever to any particularized contentions of hardship or either investigate a suit or file a suit on the part of Warfaa. Indeed, perusing the two expert reports, there's no contention that those... Counsel, let me ask you, are you saying investigate to file a suit in Somalia or the United States? To file a suit in Somalia, but to In fact, it's particularly noteworthy that... Well, didn't he have the former American ambassador testify at some length about conditions in Somalia during that period of time? Well, let me reference that. For one thing, the procedural history of this case is that Judge Brinkema granted a last-minute motion for partial summary judgment on limitations virtually on the eve of trial. The ambassador came in and testified at trial, but I was not able to question him regarding issues relating to the limitations period. If your honor would review the record of the ambassador's testimony and of his expert report, his testimony and his report were both focused on the conditions in Somalia prior to and at the time of the occurrence of the Warfaa's allegations regarding harm that was visited upon him. The Siad Barre regime fell in 1991. There is no evidence whatsoever anywhere in this record, anywhere, as to where Warfaa was during that period. What Warfaa's witnesses were doing during that period. So how could... Mr. Drennan, this is Judge Diaz. So as I understand the case law though in this area, it's not necessary that the plaintiff who's if general country conditions suggest, as in this case, that there was a civil war ongoing, that that alone is sufficient to at least allow a court to reasonably conclude that a plaintiff can't reasonably pursue his remedies while that unrest is ongoing. Do you disagree with that or have I misstated the law? I do, in part, your honor. We have, as I referenced at the top of this argument, we have conceded that Warfaa could not have brought suit in Somalia. We do not concede that he could not have brought suit in the United States during the period for which he claims equitable tolling. He has never even asserted that he was in Somalia during that period. And even if he did, he still would have to make an allegation and offer some proof of particularized circumstances causing hardship to him. And for that, your honor, we rely on the Supreme Court case, the 2015 Supreme Court case of Menomee Indian tribe of Wisconsin versus U.S. which set forth a two-pronged test to determine the availability of equitable tolling to a plaintiff. The plaintiff is only entitled to equitable tolling if he establishes the following two elements. One, that he has been pursuing his rights diligently and two, that some extraordinary circumstance stood in the way and prevented timely filing. Your honor, respectfully, there is no affidavit or declaration from Warfaa as to what he was doing during that period and why he was not pursuing his claims or making an effort to pursue his claims. Well, Mr. Drennan, can I, so just to follow up. So as I understand the plaintiff's allegations, and I think Judge Brinkman agreed with this, that even if the plaintiff could lodge a claim in the United States, that it would have been, it was reasonable for him not to pursue the claim sooner than he did because of the fear of reprisals, whether to him directly or members of his family, and that that is sufficient given the country conditions in Somalia and Somaliland to suggest that even if he could theoretically file a suit in the United States, that it would not be unreasonable for him not to do that until things had settled down in his home country. So what about that? Your honor, respectfully, what about that? He still has to make some contention that he has pursued due diligence to bring these claims. He never even made a contention that he did. And what the plaintiff is asking for here, what the FLE is asking for, is for some special exception for TVPA cases. And how do we even know that Warfa was in Somalia during that period? And as for a question as to why didn't I ask him, he has the affirmative. He has the burden of proving that he exercised due diligence and he offered no proof whatsoever. Neither of those reports contain any reference whatsoever to Warfa's particularized circumstances. It's apparent that they never even met Warfa, never considered his individualized circumstances, never interviewed him. And rather, they take the position that there is some kind of blanket exception that this litigant is going to be treated differently than any other litigant, merely because he happens to be a Somali national. We don't even have him in Somalia during that come up with one scintilla of proof in the record that Warfa was in Somalia, much less that he undertook any effort to pursue his claim. Mr. Drennan, Judge Diaz, can you hear me? Sorry. So I guess I want to ask my question again, maybe a little bit more directly. So even, and of course, we'll ask your colleague on the other side to answer that question you just posed. But even if the plaintiff in this case might not have feared personally for his own life, wouldn't it be reasonable for a plaintiff not to pursue a claim in the United States, assuming he was outside of his home country, if he feared that members of his family, for example, would be retaliated against if he filed that claim in the United States, members of his family in his home country? Don't you think that that would be sufficient for a judge to consider equitable tolling? Possibly, if and only if he had used some particularized circumstances that supported that fear. And he did not. Rather, he had two experts just opined generally, and that is insufficient. That does not meet the two-pronged test set forth in Menomee Indian tribe. It doesn't meet the first prong, and it pursued the matter diligently. There's absolutely no indication that he did. I see that I'm over time. All right. Thank you, Mr. John. Thank you, Your Honor. Mr. Schmidt. Good morning, Your Honors. May it please the court, Paul Schmidt from DLA Piper, on behalf of the appellant, Mr. Warfel. The issue today is whether equitable tolling applies to Mr. Warfel's claims under the Torture Victim Protection Act. The district court resoundingly answered yes to that question twice. This court should affirm that ruling. I just want to start by sort of framing this dispute. Mr. Ali's counsel has discussed how there's no facts or circumstances suggesting some sort of particularized harm or particularized fear on the part of Mr. Warfel. And I think we're sort of missing the forest for the trees here. Because this is a case involving serious human rights abuses. As alleged in the complaint and as proved at trial, in December 1987, Mr. Warfel was kidnapped on Colonel Ali's orders from his village in the northwestern region of Somalia. And he was targeted, not because he had done anything wrong, but because he was a member of the Ishaq clan, which was being persecuted at the time by the Baryu regime. Mr. Warfel was thrown into a dank cell, repeatedly beaten until he was unconscious and tortured over the course of several months. He remained in custody for two years under the hands of Mr. Ali and the Baryu regime. And afterwards, after he was released, out of fear of his life, he had to go to a refugee camp in nearby Ethiopia. Until January of 1991, when the Baryu regime fell, and when Mr. Warfel returned to Somalia, there was no way, no way, while in prison, at the hands of his torturer and his persecutor, and while having fled the country to Ethiopia until 1991, there was simply no way that Mr. Warfel could have investigated his claims. Investigated from a cell? Investigated while he was being tortured? This simply strains reason to even suggest this. Subsequently, the country, after January 1991, when the Baryu regime fell and Mr. Warfel returned to Somalia, the country plunged into a state of chaos and remained in that state until at least January of 1997. Mr. Warfel brought his suit in November 2004 under the TVPA, and I would like to correct the record. The first complaint was filed in November of 2004, not in June of 2005, as my esteemed counsel suggests. In the process of passing the statute, Congress recognized that extraordinary circumstances are innate in most TVPA claims and that equitable tolling should apply. Mr. Warfel's suffering and the history of this case present the quintessential circumstances in which equitable tolling applies under the TVPA, and we should understand at the outset what Colonel Alley is asking you to do today is extraordinary. There was already a trial in this case. A jury found after three days of testimony that Colonel Alley was liable for Mr. Warfel's torture. Colonel Alley doesn't challenge that verdict or any of the trial proceedings here today. Rather, he wants it to simply thrown out and start over again and further delay justice for Mr. Warfel, and let's be clear. Let's talk about the district court record in this case. In holding that equitable tolling applied... Mr. Schmidt, can I ask about that? What you just said that all that Mr. Alley is interested in is throwing out the verdict and starting over again, but I mean if he's right that equitable tolling doesn't apply, the claim would have expired, right? You wouldn't be able to start all over again. Well, that would be a question on remand, Judge Diaz, for the district court. The posture of the case when the issue was presented before trial was a pre-trial partial summary judgment motion, which was brought by Mr. Warfel, the plaintiff. So going on the scenario where for some reason this panel found that equitable tolling did not apply given the circumstances presented at summary judgment, the proper course would be to remand the district court, but I can't even imagine how that would happen, Your Honor. But again, it was not Mr. Alley's summary judgment motion. It was the plaintiff's summary judgment motion upon which this issue was brought. Can I ask another question unrelated to that? Is the test whether or not the plaintiff in this case could bring a lawsuit in any jurisdiction, his homeland or some other place, or in the United States? Where does that answer that question, if you would, please? Of course, Your Honor, and I'm glad you asked it. There's two issues that your question raises. The first is the jurisdictional issue of the statute. The statute provides for jurisdiction in U.S. courts. It is not saying anything about whether jurisdiction would be proper in some other form. So what we are looking at today is whether Mr. Warka could have brought his claim in the United States during the relevant time period or within the statutory limit. Now, there is an exhaustion of remedies provision in the TVPA which says that the litigant has to exhaust his or her remedies prior to bringing suit the United States or has to show that they've exhausted remedies, and that issue has been conceded. Mr. Drennan conceded that shortly before trial and said exhaustion of remedies wasn't an issue. I can get into the reasons from the record, but I think for purposes of this hearing, it's sufficient to say that it's a conceded issue. And I just want to, following up on your question, Judge Diaz, I just want to be clear. I want to circle back to the record that was before Judge Frankema in the district court. She relied on a thoroughly developed record, and this was not the first time this issue had presented itself. Indeed, there was a motion to dismiss on the issue earlier. And the record that was before Judge Frankema at summary judgment was, first of all, Mr. Warka's allegations in the complaint as the injuries he sustained and the time periods he sustained them. A statement from Colonel Alley himself, his own sworn declaration was in the record as well. Facts stipulated to by the parties. An expert report submitted by Mr. Warka with regard to it has been alluded to both by counsel and by your honors. An expert report describing the country conditions both prior to the fall of the barb regime in January of 1991, and then for the subsequent six years after that. And that report, it's important to note, that report was unrebutted as has already been observed. The posture of the case to suggest counsel suggests that this was sort of sprung on him or on Mr. Alley just before trial. Again, this issue had come up once before. There was no surprise that a summary judgment motion would be brought on the issue of the statute of limitations. There was a proper response time given for Mr. Alley to present witnesses or present testimony. Mr. Alley chose not to do so. And I think I'd like to, this is something that's not in our brief, but I'd like to quote the record from the hearing, the summary judgment hearing. It was a hearing to review all the pre-trial motions, but the summary judgment motion was one of them. I'd like to just read very quickly a brief excerpt from the summary judgment hearing for your honors to have some context to this. Mr. Drennan, this is in the record JA 284 and then on to 285. Mr. Drennan describes on JA 284 before Judge Frankema, their position that equitable tolling should not apply and that there's a question as to whether Mr. Alley was in the country for less or more than 10 years. And Mr. Alley's counsel who's here today says, quote, that's basically our argument to which the court responded. All right. But the point is that evidence has not been presented to the court, meaning evidence of Mr. Alley's position and counsel agrees. No. And the court responds. That's a hypothesis. And counsel responds. That is correct. Your honor. All they presented at summary judgment hearing was a theory for which there was no factual support whatsoever. And I just want to talk about the state of law, which I'll get into. I know I've got some time to get into the actual state of law and the case law that's been presented by both parties, but there is only consensus among the circuits, the sixth, the ninth and the eleventh. There is only consensus on this issue. And that is as to both aspects of tolling under the TVPA. So there's part one of the tolling, which goes for January of 1991, the bar a regime. There's numerous cases, as we cited in our brief on this very issue that say that the persistence of a repressive regime told the statute of limitations. This has been done for situations in El Salvador, in Somalia, in Haiti, in Peru, all over the world. There's no controversy about it. And similarly, there's no controversy. There's no countervailing authority that suggests that. Mr. Schmidt, if I could ask you a question. Is what you're discussing now what covers the period from sometime in 1991 to sometime in 1997? Because as I understood opposing counsel's argument, it was that during this time period, your client needed to show some particular circumstance as to him, as opposed to other citizens of Somalia, if I'm understanding his argument correctly. Is that how you understood it? And what's your response? That's my understanding as well, Judge Agee. And I just want to point the court to look at that issue. We have to look at the case law that's on it. And our contention is that there is no requirement, once the extraordinary circumstances that were occurring in Somalia, as can be found in Mr. Gansglass's report. And Mr. Gansglass was the special assistant to the U.S. ambassador, so he has some credibility. The extraordinary circumstances that were in Somalia at the time for the six years after the fall of the Bari regime, in other words, chaos, violence throughout the country, reprisals. I think in the culture, it's well known that Somalia during the George H. W. Bush administration, the end of that and the Bill Clinton administration, it was run by warlords. There was no functioning government at all. And all this is in Mr. Gansglass's report. And the case law bears this out. The case law has held that there's no need for a plaintiff to specifically allege or prove in terms of the statute of limitations. There's no need for them to show, to invoke magic words and say, I feared particular harm from such and such a person or such and such a military group or whatever. And that's borne out in the case law, Chavez v. Carranza in the Sixth Circuit, which is a case involving El Salvador. There was no evidence that the court relied upon that the plaintiff speared any sort of reprisal or repression from the regime. And in that case, the statute of limitations was told through 2004. So the El Salvador regime fell and, excuse me, I'm getting my, I think I might be getting my dates wrong, but the regime fell and the court told the statute of limitations for two additional years after that to account for the post-conflict scenario in that country. And the court held in the Chavez case that pleading extraordinary circumstances, i.e. the conditions in the country was enough. In the Jean case regime in Haiti during the 1990s, torture took place in 1983. And the statute was told all the way, excuse me, torture took place in 93. The statute was told all the way until 94. And the court held in that case, first of all, the court, nowhere did the court mention a specific fear of harm from filing the lawsuit as one of the necessary allegations. And indeed it inferred the danger by the fact that the plaintiff had been harmed in the past by the regime. And also in the Arce case, Arce versus Garcia, 11th circuit case, also involving El Salvador, that case held, quote, equitable tolling is appropriate when a movement untimely files because of extraordinary circumstances that are both beyond his control and unavoidable, even with due diligence. And finally, in this circuit, the Liz Arbe case versus Rondon, District of Maryland case in 2009, a case involving a massacre in a Peruvian village in 1985. There the regime lasted until 2000 and the court held that the statute could be told, quote, even though the complaint did not allege any facts specific to any particular plaintiff, sufficient to show why that plaintiff could not have investigated the events at issue. So the notion that this is some sort of ordinary claim where you have to show that you were, you know, as for example, if you have, if you have a breach of contract, you have to investigate whether or not circumstances were sufficient to bring a breach of contract claim, or you have to, you know, interview witnesses. That is something that doesn't, it doesn't fit with the TVPA. It doesn't fit with the purpose of the TVPA and what Congress had in mind when it passed the statute. And I think it is important to, when we're considering this question, to look at what Congress said when it passed the TVPA. And if you just bear with me for a minute, your honors, Congress passed the statute. Before you go into that, in terms of the legislative history aspect, I want to follow up something you asked and just see whether or not the logical extent of your argument, you framed it to, once you establish the extraordinary circumstances in the country, dysfunctionality, war, whatever those, the tumult is, you mean then you could plead, and you don't even have to, for example, you could have been in the United States at the time, and still there'll be equitable tolling because of what is going on in that country? Are you suggesting that as well? Well, first of all, Judge Gregory, Chief Judge Gregory, I just want to note that that's not the circumstance. That's not exactly the circumstance we're facing here. Mr. Marco was not in the United States, but putting that aside, the courts that have looked at this issue have noted, and this is in our brief, I'm happy to give you a site, have noted that one of the reasons that equitable tolling applies in the TVPA is because it's important for the plaintiff, the victim, to be able to investigate their claims. And regardless of where the victim is, whether they're in the United States, whether they're in their original country, whether they've recognized that the hindrance of investigation, which is what we're talking about in Somalia during the 1990s, that is still at play, and that does not change. The circumstances in Somalia do not change the calculus. In other words, the circumstances of the 90s were such that Mr. Warpa could not, with any diligence, have gone into Mogadishu or anywhere where there were government records, or even his village, where Mr. Ali's military force had been posted. There's no way for them to go into these areas and interview witnesses and investigate their claims and figure out where Mr. Ali is. And I think we have to also keep in mind, the TVPA was passed in 1991, 1992. Mr. Warpa's circumstances were not what they are today, where today, if I want to look and see where someone is, I can probably easily find them on the internet very readily and quickly. Mr. Warpa, the internet, I'm old enough to remember, certainly, that the internet was not prevalent in 1991, 1992. It started getting more prevalent in the mid-90s. But it's not like Mr. Warpa could have dialed up Google in the refugee camp in Ethiopia and figured out what was going on, what had happened, who had ordered his torture, whether there were witnesses, where Mr. Ali was. None of these things were possible at the time. There was no due diligence that was possible, given the circumstances. And that's the point of the extraordinary circumstances exception, which courts have recognized. And I do want to point out, I'm sorry, Judge Gregory, did you have a question? So you are in fear of retribution or directed specific risks of harm, really, of no moment once you establish the country that's your position? That's correct, Your Honor. And I'd like to add something to that, which is, even without, let's just say for argument's sake, this circuit, this panel wanted to go outside of the jurisprudence of the circuits that have already weighed in on this issue and say, okay, extraordinary circumstances are not enough for some reason. This falls within the statute of limitations quite comfortably, even if you only told until January 1991, which coincidentally is the fall of the Bari regime and when Mr. Warko returned to Somalia. Even if you only told until that date, January of 1991, it's still within the 10-year limit. And that is because from January of 1991 to October of 1992, as conceded by counsel, Mr. Ali was in Canada, which does not count under the TVPA. And from July 1994 until December of 1996, Mr. Ali was in Ethiopia, which also does not count under the statute. And the complaint was filed in November of 2004. It was not filed in June of 2005. The record specifically indicates, the district court record specifically indicates that the dismissal of the first complaint was taken on the condition by the plaintiff in the plaintiff's brief that it was done with a tolling of the statute of limitations. And on top of that, there's no authority presented by Colonel Ali's counsel that suggests that the statute should have been continuing to run until the second complaint was filed. This issue was waived, both at the original time that the second complaint was filed, there was no contention that there should have been a non-tolling, there was no bringing up of this issue at the motion to dismiss stage, and there was no raising of this issue at the summary judgment stage. This issue has been conjured up now on appeal at virtually the last minute of the case. And I would suggest that regardless of the posture of the complaint, for Colonel Ali to raise this issue now on appeal when he never raised it before, it simply doesn't comport with the rules. And just to wrap up the calculation and the analysis, my mother is a math teacher, but I'm not very good at math, but I am good enough at math to know that when you subtract the 50 months from Colonel Ali's time here in the United States, excuse me, when you subtract the 50 months from the tolling period, it brings Mr. Ali within the 120 months, it's roughly 116 months, that's in our brief. So in conclusion, your honor, I would just like to say that the district court ruling holding that equitable tolling should apply was not at the discretion that should be affirmed by this panel. Thank you very much. Thank you, Mr. Schmidt. Mr. Dren, you have some time reserved. In reply, I'd like to, or rebuttal, I'd like to address first the last contention raised by the Learning Council, namely his contention that the statute of limitations was tolled by the filing of the earlier complaint in November of 2004. That is plainly incorrect. And counsel also is respectfully incorrect when he states that the record supports that the judge ruled that the filing of the initial complaint somehow tolled the statute of limitations. She manifestly did not do so. She simply gave it out to a plaintiff that was unable to prosecute his case at that time, apparently, and allowed him to take a dismissal on the condition that he refiled within 45 days. And he did refile within 45 days. However, at no point did Judge Brinkema rule that the filing of that complaint in November of 2004 tolled the statute of limitations. That's entirely... Mr. Dren, Judge Diaz here, what do you think Judge Brinkema was trying to do with that conditional order, if not toll the statute? There have been cases where this sort of thing has come up before, which we cited in our reply brief. And in circumstances such as this, where the court allows a dismissal without prejudice, the case is treated as if it had never been filed. She allowed them to refile within 45 days so as to tell them that, look, you better refile or else I'm going to make this a dismissal with maybe not directly allowing a motion to amend, essentially. And that, I think, obviously would toll the statute, right, if the case had remained alive that way. Your Honor, the case was dismissed. The new case was given another docket number. It's a completely distinct action. And if, as Your Honor is appearing to consider interpreting it, that somehow this represented an amendment, she could have stayed the action, and she could have expressly pointed that out in her order, which she manifestly did not. So the only reasonable inference to draw from that is that the initial action did not toll the running of the statute of limitations. There was no discussion of the limitations period and how close we were to 10 years or equitable tolling or anything of that sort in that earlier record. Your Honor, what the FLE is trying to do here is extraordinary. They're trying to divine what the judge did in an earlier case and make a statement that this is what the judge intended. And there's no record evidence to support that. There just isn't. Mr. Brennan, can I ask, just moving on to another topic, so your counsel on the other side cited a host of cases that he said stands for the proposition that given the nature of a TVPA claim that extraordinary circumstances standing alone, so long as there's evidence of that, is enough to toll the statute. So are you asking, first of all, do you agree with his understanding of those cases? And if you do, are you in effect asking us to just ignore those cases or suggest that they simply aren't persuasive? I'm asking the court to distinguish those cases. And in our reply brief, we take them seriatim, one by one. And all those cases that were recited by learning counsel, we addressed in our reply brief. And with regard to, for instance, the case involving the Haitian gentleman, there was evidence that that gentleman had particularized harm and an incredible case for particularized harm as to why he couldn't have filed his case. And he was targeted. And you might say, well, wasn't Warpaw targeted too? Well, the problem with that analysis, your honor, respectfully, is that the regime that Warpaw fell in 1991. What did Warpaw do after that? There's no evidence, none of what Warpaw did or even if Warpaw was in Somalia during that period. And counsel goes on to suggest that, well, it doesn't matter if he was in Somalia or not in response to your honor's question. But that's not what the expert opinion addresses. The ambassador that counsel likes to refer to, his testimony did not cover at all what happened in Somalia after the fall of the regime. The expert that did address that issue did not even consider the specter of the plaintiff being outside of Somalia. And there was no consideration whatsoever given to the witnesses, whether any of the witnesses were subject to intimidation. None, nada. I mean, this is, I keep harping on this point, but the record is just absolutely stark by the absence of any evidence whatsoever as to what transpired vis-a-vis Mr. Warpaw, vis-a-vis his witnesses during that period. I see that I'm nearing the end of my water clock here on the questions. I'd be happy to answer. Thank you so much, Mr. Drennan. Thank you so much, Mr. Schmidt as well. We would love to be able to come down in our normal tradition to greet you. We cannot do that, but know that we appreciate very much your being here and your fine argument. Thank you so much and hope that you will be safe and stay well. Thank you. Thank you, your honor. Thank you, your honor. Thank you, your honors.
judges: Roger L. Gregory, G. Steven Agee, Albert Diaz